Number 2011-1209, CERNER CORP v. VISICU, Mr. Stark. Good morning. Good morning. May I please record? CERNER is appealing the District Court's Inequal Conduct finding for two reasons. First, CERNER's Inequal Conduct case is based on, premised on, prior art that the jury heard about in reaching its unanimous verdict that VISICU's 656 and 708 patents were invalid as obvious. Second, in this case unlike a lot of cases, we have the luxury of knowing what VISICU's inventor and co-founder knew and believed about invalidating prior art in 1999 through 2004 at a time when he owed the PTO a duty of candor and a duty of disclosure. This is not a garden variety post-bear sense case of non-disclosure in which an inventor withholds prior art during prosecution, discloses certain references but not others, takes no position during prosecution about the import or relevance of that prior art, and then years later at trial is able to make an arguably plausible and good faith explanation for the non-disclosure. In those cases, intent to deceive, particularly after a fair sense, likely won't be found and it probably shouldn't be found, but that is not this case because we know what the inventor knew about invalidating prior art, including Dr. Shabbat's ICU system that included smart alarms, what are referred to in the patent as a rules engine. We know what he knew about those at the relevant time period and we also know what he knew about a vital com ICU system during the relevant period. In this case, the district court of course applied a somewhat different standard on materiality but did find that the references were material. Now, even if we assume that under their assents these references are material, you still have the hurdle of overcoming the intent problem and the district court, even assuming these were material, nonetheless found that there wasn't any intent. That's a difficult burden for you. Yes, it is. It's very difficult. We believe that it was clear error given the evidence and the totality of the circumstances, clear error as an underlying factual matter for the district court to determine that there was no intent to deceive. I say that because it's a little bit of a question of timing. My understanding is that the critical time when one must determine what information to disclose to the PTO is during prosecution, in this case from 1999 to 2004. The relevant time period is not necessarily what the inventor came to believe or believed during trial. And so, given the fact that really the only evidence on one side of the ledger about what the inventor knew during that relevant time period when he owed this duty of candor and disclosure is that he fully appreciated how important Dr. Shabbat's smart alarms were and how important the vital com ICU system was We have really nothing on the other side of the ledger other than essentially a mere denial of intent to deceive. I think under those circumstances, it was clearly erroneous as a factual matter for the district courts to find a lack of intent and therefore ultimately decide that there was no ample conduct. The district court, of course, considered all of the evidence and considered the testimony and came to the opposite conclusion. The district court was there, had a sense to evaluate the credibility of the witness who testified, and recognized that there was a basis for the statement that he didn't appreciate that it was particularly relevant. It's difficult for us to overturn that, is it not? It is. It's rare for this court to overturn that. It's not unheard of. The court has done it before. I haven't seen the court do it post-Parisense, but I know in cases such as Criticon, Parisense certainly didn't make it easier for you. It did not do us any favors. Maybe you can turn to the other issues that are on the cross-appeal. Obviousness, for example. Here we have a unanimous jury that saw a lot of evidence, heard a lot of testimony about each of the four RAM factors. The key question here was whether the prior art metavision system involved prescribing care for the patient, right? Yes, my understanding is that Visicu's objection is that the metavision system constituted uncorroborated prior art that should not have been considered. I thought you found this providing patient care limitation satisfied by the actual operation of the metavision system rather than by the manual itself, right? It's based on Schoenberg's testimony as to how the metavision system was actually used. Right, right. The metavision user manual, which supplemented and we believe corroborated his testimony, included a section about managing patients. I'll get to that in a moment, but your theory is that Schoenberg testified as to the prior use of the metavision system and that the prior use of the metavision system involved prescribing patient care. Yes. Correct? Correct. But when I look at the four deposition pages in the joint appendix, I have difficulty finding any such testimony. Put aside the question of corroboration for the moment. I have difficulty in finding explicit testimony that the metavision system was used to prescribe patient care. Now, maybe that's because there are other parts of the Schoenberg deposition that weren't included in the joint appendix that said that, but can you help me on that? Let me try. Schoenberg, let me try to point you out to a piece of Schoenberg's testimony where I believe he disclosed at least a type of... Are there other parts of the Schoenberg deposition that you rely on for this prescribing patient care limitation being practiced by the metavision system that's not in the joint appendix? No. It's in the joint appendix. That's my... Okay. Could you show me where the Schoenberg testified that the metavision system was used to prescribe patient care? Let me give you an example of where he talked about a type of patient care that's performed by the metavision system, and that's on the appendix at A61335. Which volume are we talking about here? I'm sorry? Yeah. Which volume? Volume nine. Nine. I'm sorry. And I believe on that page, your honor... Which page? I'm sorry.  335, okay. Yeah. What line? I'm sorry I don't have the line. He was discussing the discharge or transfer of patients. Yeah. And what he was saying was the metavision system, one way in which it managed patient care was that it determined or assisted the caregiver in determining whether and when to actually discharge or transfer a patient. What does that have to do with the prescribing patient care limitation? There is no... There's a patient management limitation. Yeah, but I thought the patentee's argument was that required prescribing patient care. Well, I don't know that that's their argument. I know their argument is that the prior art, including Schoenberg, apparently miss or do not disclose what they refer to as this key limitation, which is providing patient management. And that patient management concept came in through the remote command center. So I think they're... But I thought their contention was that patient management meant prescribing care. Actually saying what the care should be. Well, I don't know that that's their position. I do know what they have claimed is an automated, fully automated computerized system that supplements and assists. Well, no, I don't think their contention is that it has to be fully automated. They're saying that some doctor or remote location makes a determination as to what the care should be and transmits that over the system. No, in fact, I respectfully disagree that that's what they're saying because they told us that that's not what they were saying. No, they took out the reference to a person being part of it. But it seems to me that they're prescribing patient care on an individualized basis, not being automated, is part of the limitation. I, again, would respectfully disagree because they're in prosecution. Well, let's assume for the moment, we can ask them about this. Let's assume that they're saying that you have to be prescribing patient care from the remote location, okay? Does Schoenberg say that the Medivision system did that? Yes, I believe it does. Where? The closest I can come is on that page where the Medivision system prescribes when to discharge a patient from an intensive care unit and whether to transfer that patient from an intensive care unit. I was expecting you to make reference to some of his testimony at A61-333 and 334. On 333, line 85-9, there's an answer there that refers to users can review the data and interact on the patient that is just suggested to them. It's a rather oblique reference to it. And on 61-334, lines 88-2-10, it talks about the authorized user can log in, see a patient list, would select a patient, and also interact with the system, like change a solution or a medication for the patient if they're authorized to do so. Does that testimony not support your position? I believe it does, Your Honor. The stronger... You're supposed to be prepared on this, right? You're supposed to know the record better than we do. And you're supposed to be able to point us out what you're relying on. Well, okay, you are well into your rebuttal. Would you like to save the balance? Yes, I would. Okay, very good. Mr. West, good morning. Good morning. I will first address the inequitable conduct issue and then turn to the cross. Let's pick up where we just left off. I'm happy to do that. Your argument, as I understand it, is that the claim requires prescribing patient care from a remote location. Yes, the words that are used are providing care, managing care, but yes, that's the essence of it. Okay, and is there a dispute as to whether the Medivision system in actual practice did that? Yes. So there is a dispute about whether the Medivision system actually did that, and there's also a dispute about whether there was sufficient corroboration as to Schoenberg's testimony that the system did that, right? Correct.  Schoenberg's testimony didn't really say that Dr. Hereford was managing patient care in the sense of prescribing. What we objected to was that was the only evidence of anybody doing anything with ICU care that was remote from the ICU. He said remote from the ICU, and that's what we objected to, that he didn't even really say that they were managing care in the sense of he was prescribing things for the patient. Well, what about the testimony that Judge Lynn just called out? All that is referring to is the monitoring of patient data, and the part that you read, Judge Lynn, about the clinicians interacting. That's talking about the clinicians getting together and talking, not doing anything in terms of managing the patient. But in all of these systems, including the Medivision system, the debate about whether it's monitoring alone or monitoring and managing strikes me as a little bit strained, in the sense that isn't the jury free to draw the conclusion that when patient data is monitored by professionals, whether they're doctors or nurses, that the purpose of monitoring is to provide patient care? Isn't that what they're doing? Ultimately, but the question here is where is that patient care coming from? In this case, the claims clearly recite the requirement for a remote command center. There is no remote command center in that sense anywhere in the prior arc. It's not in David's, it's not in Chabot's, it's not in Medivision, it's not in Viacom, it's not in Grundy, it's not anywhere. What the inventors here did... Isn't a monitoring station at a nurse's desk in an ICU unit remote from the patient? It's remote from the patient, but it's not remote from the ICU. But she is not managing in that she is not providing the expert critical care. The whole point of this invention was to leverage the expert skills of the intensivist, and the inventors said with a radical idea that take the intensivist out of the ICU and put them in a remote command center where their skills can be leveraged to not only interact with one patient or three patients or five patients, but dozens and dozens of patients regardless of where they were, in the ICU in a major hospital or in an ICU in a remote rural hospital. But the Medivision system... Forget about the limitation that has to be managing multiple locations. The Medivision system, the argument is, actually didn't disclose managing patient care from a remote location. No, it doesn't, and I disagree. The only evidence, the only solid evidence that is not uncorroborated is the part in the manual about the administrative functions. No, and if you look at 44861 in Volume 7... Thank you. 44861. This is the Medivision manual. And there, at the top of the page in the fourth line, it talks about the doctor from the remote location entering a diagnosis for the patient and anything else, right? So at least this part of the manual contemplates that somebody from a remote location will enter the diagnosis, right? Let me just read this. Yes, and that's talking about doing it at a bedside computer or an office connected to the local network, which is in a hospital. Why does the office connected to the local network have to be in a hospital? Well, that's what the Medivision system was. But of course, the reference is being asserted for its teachings in an obviousness context. It's not an anticipation argument, it's an obviousness. I understand that. So again, I go back to, wasn't the jury free to draw a conclusion that there was a sufficient basis here to find obviousness? No, it's not really talking about... Medivision's not talking about anything that comes close to meeting any limitation of the claims of the patent. It's not providing remote critical care from a dedicated remote command center. Isn't it reasonable, though, for a jury to find that managing patients also includes providing or prescribing care? Well, it depends on what you mean by prescribing care. I can answer that generally, yes. How about entering a diagnosis? I don't think entering a diagnosis is necessarily... Providing expert care is entering the order as to what should be done in response to a particular critical situation. That's what the intensivist does, and that's the critical care that is administered. It's not simply entering a diagnosis. It's deciding what to do about it. That's the providing care. That's the managing care. But the manual also talks about managing patients on 44 feet 57. Yeah, that's correct, but that's managing patients right there. The only part that talks about doing it remotely is on 862, which makes it clear that they are only talking about the administrative functions of registering and discharging, things like that. Maybe. But the reference I pointed you to is talking about doing managing patients remotely, whatever that may mean. That's a different part of the manual than the one that you're referring to, which talks about managing patient care in a different context. The problem is, Your Honor, that when you read managing patients, you have to do so without hindsight knowledge of what the inventors did here. And I submit that when people were looking at this back before the inventors made their invention, they read managing patients, they didn't think that that was doing it from a remote command center. They thought that was doing it in the ICU at the bedside, because that's the way things are done. But that's not what this is referring to. What? The passage on 404057 is not talking about bedside managing patients. It says since the Medivision computers and the ICU are linked together in one network, Medivision serves a system for managing patients. The information is in a sample computer and so on and so forth. Your Honor, at that time, before Medivision, it was the unstated assumption that everything done for the ICU patient was managed in the ICU at the bedside. That's the unstated assumption that's in all of this prior art. It's not stated because everybody knew it. That was the common knowledge. On 857, again, to the same paragraph that Judge Dykes is referring to, in that second paragraph around the third line, it says, you will most likely use the computers connected to devices around each ICU bed to work with the flow sheets. And it goes on talking about bedside workstations. Doesn't that necessarily mean that there's some stations that are not bedside and wouldn't those be remote? Well, I think they had them at the bedside, but they also had them at other places at the ICU, the nurse's central station in the ICU. It says specifically you can work with any patient from anywhere on the network, which isn't that saying that you're doing something remotely? But it's not in a dedicated remote command? Well, that may be, but the question is, the first question is whether there was some use of remote managed care, maybe not in a different physical location, but if you can do it within a hospital remotely, maybe it's not so much of a step for the jury to conclude that it's obvious to do it from a physically remote location. But you're not doing it for a remote hospital where there is no intensivist. You're not leveraging. You're doing it with the intensivist in the hospital where he's dealing with patients on a one-to-one basis. You're not dealing in a remote command center where the intensivist skills are leveraged. Do you agree that this manual talks about managing care from a remote location within the hospital? I don't think that's what it means. I really don't, Your Honor. What do you disagree with? What we're looking at is remote location, meaning that let's say there's a location in the basement of a hospital. That's not remote? It could be in the basement. It could be outside the hospital entirely. But the point is that you're dealing with things not only just in that hospital. You're dealing with patients in other hospitals too. That's the key to this invention. There was a shortage of intensivists. There just weren't enough to go around. And the inventor said let's take an intensivist and put him in a remote command center, and that way he can deal with many patients at a time. That is what's transformed health care in ICU care. Well, if you assume for the moment with us that this manual, the Schoenberg testimony, talks about managing patient care remotely within the hospital, why is it impermissible for the jury to conclude that it was obvious to do that from a physically remote location as well? Why is that such a large step that the jury couldn't make that inference? It is a large step because there was nothing in the prior art that suggested making that step. There was nothing that said let's get the intensivist out of the ICU and put him remotely where he can manage simultaneously up to 50 people in intensive care units and administer care expertly for them all at the same time. You're well into your rebuttal period. Would you like to reserve the rest of your time? I will. Thank you, Your Honor. Very good. Mr. Starr, you've got just shy of two minutes. We believe that Schoenberg's testimony about the Medivision system was fully corroborated by the manual itself and by Cerner's expert, Dr. Safran, who testified from personal experience that he had with the Medivision system that the system did in fact provide patient management and patient care. So we believe the corroboration is there and Schoenberg's testimony did not have to stand on its own. However, even in the absence of Schoenberg, this key limitation that they keep talking about is disclosed in the prior art, including the David patent. And the question of what was disclosed in the prior art is, of course, a jury question. And we need to presume that the jury found that piece, that key limitation, as they refer it, in the prior art. If not Schoenberg, they certainly could have found it in the David patent. David teaches, and I would invite the court to look at Figure 5 from the David patent and the teachings of the David patent, but David clearly discloses a remote, centralized location that provides automated, computerized data storage it provides alarms, and it actually provides diagnosis from a remote command center to multiple patients that are spread out across the country. This is providing home health care remotely? They refer to it as a semi-intensive care capability, the David patent. Yes, sir. And they also talk about it, it's suitable for use, David is suitable for use in any situation where a patient is to be monitored at a site remote from a central station. So the central station concept is clearly taught by David. From the central station, he can do all sorts of patient management, including diagnosing patients from that central location. You've got around-the-clock supervision of remote patients, up to 50 patients simultaneously from the central station. And then Dr. Saffron, again, supplemented the clear teachings of the David patent itself with testimony about the David patent. So to the extent Schoenberg's testimony was uncorroborated and should be disregarded, which we strongly believe it was not uncorroborated, the jury certainly could have found, and in fact we emphasize the trial, that the David patent taught this remote command center from which patient care and management would be provided. In the David patent, is there a plurality of ICU units that are being monitored? There are a plurality of remote locations. It's not ICU. It is not ICU. It's mostly patients, isn't it? Isn't it mostly patients? Doesn't David teach mostly about patient as opposed to plurality or numerous ICU units? Yes. David does teach that you can simultaneously care for up to 50 patients, remote patients from the central location, and he referred to that as a semi-intensive care capability. All right. That will have to be the last word since your time has expired. Thank you very much. Thank you, Mr. Starr. Mr. West, you've got a few more minutes. All right. What about David? I've also addressed Grundy. David is simply a surveillance. It's monitoring. It doesn't purport to manage care, and it's a home system. It's not ICU. But it does involve a remote location, and it does involve multiple patients, right? No question about that. It does involve a remote location, but it's a remote location for surveillance, not managing. It's not ICU. It's not doing anything remotely that would suggest being mentioned. Grundy is similar. It's a consultation. It's one-on-one. It's not simultaneous with a number of patients at the same time, and it's something that their expert didn't even really rely on. So there's just no substantial evidence that one skill in the art would have taken these things and put them together to arrive at claim 17 because there is simply no suggestion in the prior art that the way to do this was to take the intensivist out of the ICU. That's the key because once you take him out of the ICU, you can leverage his abilities because there was a shortage of intensivists, a very critical shortage of intensivists that was plaguing ICU care. The quality of ICU care was going down due to the invention. It's going up, saving millions of lives, and that is the key. The intent of getting the intensivist out of the ICU into a remote command center was a key. That suggestion is nowhere in the prior art, and without it, nobody had a clue as to how to pick these pieces out and put them together to arrive at claim 17. I thank you. All right. Thank you very much. I thank both counsel. The case is submitted. Next appeal is 2011-7089.